UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DONALD WALKER, JR.,

        Plaintiff,

  v.                                     Case No. 16-C-902

JUDY SMITH,
PATRICK MURPHY,
PHILLIP WHEATLEY, and
DANIELLE FOSTER,

        Defendants.

## DECISION AND ORDER

Plaintiff Donald Walker, Jr., proceeding *pro se*, filed this action under 42 U.S.C. § 1983 alleging that his civil rights were violated while serving a prison sentence at Oshkosh Correctional Institution. He claims that Warden Judy Smith, Dr. Patrick Murphy, Dr. Phillip Wheatley, and Health Services Unit Manager Danielle Foster violated his constitutional rights by their deliberate indifference to his serious medical needs. Currently before the court is the defendants' motion for summary judgment, which is fully briefed and ready for the court's decision. For the following reasons, the court will grant the defendants' motion and dismiss the case.

## BACKGROUND

Walker was housed at Oshkosh Correctional Institution at all times relevant to this case. (Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 26.) The defendants all work at Oshkosh: Smith is the warden; Foster is a registered nurse and the manager of the Health Services Unit (HSU); and Wheatley and Murphy are physicians. (DPFOF ¶¶ 2, 3, 6.)

Walker was transferred to Oshkosh on June 28, 2012. (DPFOF ¶ 34.) At that time, nursing staff screened Walker, and no hearing impairment was indicated. (*Id.*) Walker began to complain about hearing loss in April 2014. (DPFOF ¶¶ 35-42.)

On May 20, 2014, Walker was seen at Rexall Hearing Center. (DPFOF ¶ 44.) Rexall performed an audiogram that showed Walker had profound hearing loss, which was worse in his right ear. (*Id.*) A hearing instrument specialist at Rexall recommended that Walker be given two digital hearing devices and that a follow-up appointment be scheduled so he could receive the hearing aids. (DPFOF ¶¶ 45, 48.) Pursuant to DOC policy, only one hearing aid was approved at that time. (DPFOF ¶¶ 45, 48, 108-109.) Walker received a hearing aid for his left ear on August 20, 2014. (DPFOF ¶ 49.)

Wheatley began working at Oshkosh in October 2014. (Decl. of Wheatley ¶ 2, ECF No. 27.) Wheatly first met with Walker about his hearing issues on February 9, 2015. (DPFOF ¶ 55.) Walker told Wheatley he was housed in W-building and was having trouble communicating with people. (DPFOF ¶ 56.) Wheatley recommended that Walker be moved to an open unit (the defendants do not explain what this means) and be re-evaluated at Rexall to determine whether two hearing aids or an adjustment of the current hearing aid would help. (*Id*.) Wheatley also approved Walker to receive a vibrating alarm clock and his unit was provided with a closed-caption phone. (*Id.*)

On February 12, 2015, Murphy reviewed Wheatley's order and discontinued the recommendation to move Walker to an open unit because security must address all housing assignments. (DPFOF ¶ 58.) He affirmed Wheatley's order to send Walker's hearing aid to Rexall to see if it needed cleaning or adjustment. (*Id.*) However, he cancelled Wheatley's order for a second hearing aid and his order to send Walker to Rexall for assessment for a second hearing aid. (*Id.*)

2

Murphy cancelled the orders related to a second hearing aid because DOC policy requires prior authorization from the Bureau of Health Services. (DPFOF ¶¶ 23, 58, 59, 116.) Murphy believed that, as an initial step, it was sufficient to send the hearing aid to Rexall for cleaning and/or an adjustment. (DPFOF ¶¶ 23, 58, 59.) This was Murphy's only involvement in decisions related to Walker's care. (DPFOF ¶¶ 120-122.)

Because Wheatley was new to Oshkosh, he did not know that housing assignments are a security issue or that prior approval for a second hearing aid is required. (DPFOF ¶ 60.) Wheatley agreed with Murphy's assessment, so he did not immediately submit an authorization request for a second hearing aid; he wanted to first obtain a recommendation from Rexall about the next best step. (DPFOF ¶ 61.) (The parties do not state whether or when Walker's hearing aid was sent to Rexall.)

On February 20, 2015, Walker submitted an information request asking if it was true that inmates are allowed only one hearing aid even if they need two. (DPFOF ¶ 62.) A nurse responded and told him that it was rare for an inmate to receive two hearing aids and that special permission from Madison is required. (DPFOF ¶ 63.) On March 5, Walker had an appointment with a nurse; she prescribed him ibuprofen for his headache pain. (DPFOF ¶ 64.)

On April 7, 2015, Walker asked for a second hearing aid and asked if he could visit Rexall for an adjustment to his left hearing aid. (DPFOF ¶ 65.) Wheatley saw Walker on April 13, 2015. (DPFOF ¶ 66.) Walker complained that his hearing was getting worse and the frequency of his headaches was increasing. (*Id.*) He questioned whether his headaches were related to his hearing loss and he asked if he could move to "the open center" for better phone access. (*Id.*) The parties do not explain what the open center is. Wheatley ordered an off-site evaluation at Rexall for an

3

adjustment of Walker's left hearing aid. (DPFOF ¶ 67.) Wheatley also scheduled a follow-up with Walker in about three months. (*Id.*)

On May 12, 2015, Walker was seen at Rexall. (DPFOF ¶ 69.) The hearing instrument specialist noted that Walker complained that the hearing in his right ear was worse, he was having frequent headaches, he was often dizzy, and he was afraid that he was going to lose his hearing. (*Id.*) The specialist made a plan to fit Walker with a custom ear piece and recommended a follow-up for the fitting of a new ear mold and a re-test. (DPFOF ¶ 70.) (The parties do not explain what a custom ear piece or ear mold is or how they differ from a hearing aid.)

That same day, after reviewing the recommendation of the Rexall specialist, Wheatley submitted an authorization request for the re-testing of Walker's hearing and for the fitting for a new ear mold. (DPFOF ¶ 71.) The request was approved later that day. (DPFOF ¶ 72.)

On May 19, 2015, in an effort to address Walker's complaints of headaches, Wheatley prescribed migraine formula acetaminophen, as needed, for four months. (DPFOF ¶ 73.)

On June 9, 2015, Walker was seen at Rexall for another hearing test and to be fitted for a new mold, if needed, for his left ear. (DPFOF ¶ 74.) On July 14, 2015, Wheatley noted that Walker was nearly deaf in his right ear and that a new mold would be made for his left ear. (DPFOF ¶ 76.) Also at that appointment, Wheatley suggested that Walker try to avoid regular use of Excedrin migraine and prescribed ibuprofen twice per day, as needed, for six months with a limit of sixty per month. (DPFOF ¶¶ 78, 79.) Walker was fit with an ear mold on July 28, 2015, and his settings were adjusted. (DPFOF ¶ 80.)

Walker filed this lawsuit nearly a year later, on July 11, 2016. (Complaint, ECF No. 1.) According to the defendants, Walker did not have another appointment with health services until

4

October 25, 2016, when he met with Wheatley. (Brief in Supp. of Defs.' Mot. for SJ at p. 7, ECF No. 25.) Walker informed Wheatley that he was having headaches on a nearly daily basis, and the ibuprofen was no longer working; he wondered if the headaches were connected to his hearing loss, which was worsening. (DPFOF ¶ 84.) Wheatley examined Walker's ear canals and assessed him with bilateral neuro sensory hearing loss, severe to profound. (DPFOF ¶ 85.) He made a plan to inquire about obtaining a second hearing aid for Walker. (*Id.*) Wheatley also prescribed Sumitriptan, as needed, for his migraine headaches. (DPFOF ¶ 89.)

On November 10, 2016, Wheatley submitted an authorization request for a second hearing aid. (DPFOF ¶ 90.) The request was approved the next day. (DPFOF ¶ 91.) Walker initially refused the second hearing aid (because of the pending litigation), but he later reconsidered and received it on December 29, 2016. (DPFOF ¶ 97.) The next day, during a follow-up appointment, Walker told Wheatley his headaches were about the same and that the Imitrex did not help (it is unclear who prescribed Imitrex or when it was prescribed), although Walker had significantly decreased his use of the ibuprofen. (DPFOF ¶ 98.) Wheatley told him to wait and see if the second hearing aid helped. (DPFOF ¶ 100.) On April 7, 2017, Walker indicated that his headaches had been decreasing since obtaining the second hearing aid. (Richter Decl., Ex. 1005 at p. 4, ECF No. 42-1.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that

there is a genuine issue for trial." *Siegel*, 612 F.3d at 937 (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

**ANALYSIS**

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. Amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An inmate's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012).

The parties agree that Walker, who suffers from profound hearing loss, suffers from an objectively serious medical condition. As such, the court need only consider whether Walker has set forth sufficient evidence for a jury to reasonably conclude that the defendants were deliberately indifferent to that serious medical condition. He has not, so the court will grant defendants' motion

6

for summary judgment and dismiss this case. The court will explain its decision with regard to each defendant below.

*1. Dr. Phillip Wheatley*

Walker does not dispute that Wheatley provided him with some medical treatment. Instead, he argues that Wheatley was deliberately indifferent to his hearing loss because he failed to promptly provide him with a second hearing aid despite the specialist at Rexall recommending that Walker be given two hearing aids. A plaintiff alleging deliberate indifference who has received some medical care addressing his needs must show that the treatment he received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" the plaintiff's serious medical condition. *Snipes v. De Tella*, 95 F.3d 586, 592 (7th Cir. 1996). Mere disagreement with a doctor's medical judgment is insufficient to establish deliberate indifference. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007).

Here, the evidence demonstrates that Wheatley consistently evaluated Walker following his complaints regarding his hearing loss and headaches. While it is true that he did not immediately request authorization for a second hearing aid, he did try multiple alternatives in order to address Walker's complaints, including requesting Rexall to clean and adjust the settings on the hearing aid, ordering follow-up audiograms to measure changes in Walker's hearing, and ordering a custom ear piece. In fact, it appears that the custom ear piece, at least for some time, addressed Walker's needs because, after receiving it, he did not request additional treatment or appointments with health services for more than year. Further, Walker sets forth no evidence to suggest that his hearing worsened over time because Wheatley chose to pursue alternatives before requesting authorization for a second hearing aid.

Finally, when Walker complained of headaches, Wheatley did not persist with a single treatment; instead, he prescribed different medications over time in an effort to provide Walker with relief. Once Wheatley exhausted other options for treating Walker's complaints, he requested authorization for the second hearing aid.

It is clear that Walker would have preferred that Wheatley not explore other alternatives prior to seeking authorization for the second hearing aid, but nothing in the Constitution requires that an official comply with the treatment preferences of a prisoner. Similarly, nothing in the Constitution requires that an official defer to the opinions or recommendations of another care provider. "[T]he prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long a the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). The court finds that Wheatley consistently pursued reasonable measures to ensure Walker received treatment for his medical conditions. This is all Constitution requires.

*2. Dr. Patrick Murphy*

Murphy's only involvement in Walker's care was to review Wheatley's February 9, 2015 order. Wheatley was new to the institution and lacked knowledge of the many DOC and institution policies. Murphy revised Wheatley's order and canceled the orders to move Walker to a different part of the institution and to have Walker assessed for a second hearing aid. Murphy informed Wheatley that, according to policy, only security can move inmates to a different part of the institution and physicians should consider other alternatives to address hearing loss before ordering

8

a second hearing aid. Murphy did not tell Wheatley that he could not request authorization for a second hearing aid; he only told him to consider other alternatives, if any, before doing so.

Murphy was not deliberately indifferent to Walker's medical needs simply because he revised Wheatley's order. Again, the court understands that Walker would have preferred to have immediately received a second hearing aid, but Walker's preference has no bearing on what the Constitution requires. Murphy did not prevent Wheatley from treating Walker. Instead, he recommended that, in line with DOC policy, Wheatley explore whether treatment options short of a second hearing aid could resolve Walker's complaints. Making such a recommendation does not violate the Constitution.

*3. Warden Judy Smith*

Smith had only a single interaction with Walker: On May 16, 2016, Walker wrote her a letter asking her if she had told a representative from Deaf and Hard of Hearing that the DOC will pay for only one hearing aid. (DPFOF ¶ 81.) He also asked her to send him the guidelines for requesting authorization for non-urgent medical treatments. (*Id.*) Smith responded to Walker's letter on June 9, 2016. (DPFOF ¶¶ 82-83.)

Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (emphasis added) (*quoting Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)). In other words, § 1983 makes public employees liable "for their own misdeeds but not for anyone else's." *Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir.2009). Further, non-medical defendants, such as the warden, "can rely on the expertise of medical personnel. . . . [I]f a prisoner is under the care of medical

9

experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011).

Smith did not participate in any treatment decisions related to Walker; thus, she did not cause or participate in any alleged constitutional violation. Further, Smith knew that Walker was being treated by Wheatley, so she was justified in believing that his medical needs were being addressed. Walker concedes that Smith was not involved in the treatment of his hearing loss and therefore cannot be held liable on that basis; however, he argues that his claim against Smith should survive summary judgment because she did not install technology at the institution that would ensure that people like him would be able to use the phone. (Pl.'s Br. in Resp. to SJ, at p. 17, ECF No. 37.) Walker was not permitted to proceed on such a claim in the screening order (ECF No. 11) nor did he raise these allegations in his complaint (ECF No. 1). Because Walker is not permitted to advance new arguments in response to a motion for summary judgment, the court will not consider this claim. *See Abuelyaman v. Illinois State Univ.,* 667 F.3d 800, 814 (7th Cir. 2011).

*4. Health Services Unit Manager Danielle Foster*

Walker's claim against Foster fails for the same reasons his claim against Smith fails. Foster's involvement with Walker was limited to her responding to an inquiry from the institution complaint examiner confirming that no authorization request had been made (at that time) for a second hearing aid and explaining that the "type of specific care or treatment [] offered is a matter of professional medical judgment." (Compl. at p. 4-5, ECF No. 1.)

Foster was not involved in any decisions to approve or deny a second hearing aid, and she was not responsible for Walker's medical treatment. Thus, she did not cause or participate in any alleged constitutional violation, which is required for liability. Further, Walker has not set forth any

evidence to suggest that Foster had reason to believe that Wheatley's treatment plan was likely to harm Walker. As such, Foster was well within in her rights to defer to Wheatley's judgment regarding Walker's medical care. *See Holloway*, 700 F.3d at 1075.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (ECF No. 24) is **GRANTED**. The Clerk is directed to enter judgment dismissing the case with prejudice.

**SO ORDERED** this 26th day of May, 2017.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court